956 F.2d 1339
 58 Fair Empl.Prac.Cas. (BNA) 315,
58 Empl. Prac. Dec. P 41,379,
34 Fed. R. Evid. Serv. 1420
Pearl H. DOUGLASS, Plaintiff-Appellant,
v.
EATON CORPORATION, Defendant-Appellee.
 No. 91-1337.
 United States Court of Appeals,
Sixth Circuit.
 Argued Nov. 7, 1991.
Decided Feb. 21, 1992.
 
 Rodney J. O'Farrell (argued) and Donald T. Popielarz (briefed), Saginaw, Mich., for plaintiff-appellant.
 Richard E. Lieberman, James A. Burns, Jr. (argued and briefed), Ross & Hardies, Chicago, Ill. and David R. Collette, Smith & Brooker, Saginaw, Mich., for defendant-appellee.
 Before KEITH and RYAN, Circuit Judges, and ALDRICH, District Judge.*
 KEITH, Circuit Judge.
 
 
 1
 Plaintiff-appellant Pearl H. Douglass, a Michigan citizen, ("Douglass") appeals the judgment of the district court overturning the jury verdict in her favor and rejecting her claim of discriminatory discharge against the defendant-appellee Eaton Corporation ("Eaton"), an Ohio corporation, under the Michigan Elliott-Larsen Civil Rights Act, Mich.Comp.Laws Ann. § 37.2101 et seq.
 
 I.
 
 2
 Douglass, a black woman, was an hourly employee at Eaton's Saginaw, Michigan manufacturing plant. Prior to her discharge, Douglass had approximately 12 years seniority. Until the incident giving rise to the present action, Douglass received no reprimands or any form of discipline. As a production worker at the plant, Douglass was represented by Local No. 433 of the Allied Industrial Workers Union (the "Union"). The collective bargaining agreement between Eaton and the Union included "Shop Rules and Regulations" that prohibited, upon penalty of discharge, "assaulting another, brawling, or fighting on the premises."
 
 
 3
 On November 21, 1985, Douglass was involved in a fight with two white co-workers, Robert and Jan McCrossen. As a result of the altercation, Douglass was fired. Neither of the McCrossens were discharged. The Union sought to have Douglass reinstated by meeting with Eaton management on several occasions, but Eaton upheld its original decision to discharge. Having exhausted her administrative remedies, Douglass brought the present action in the district court on the basis of diversity, alleging that her discharge was discriminatory.
 
 
 4
 Douglass contended at trial that tensions between herself and the McCrossens had been brewing for quite a period of time prior to the incident in November 1985. She claimed to have sought the aid of both the Union and management in an attempt to resolve the matter. She stated that a plant superintendent told her that he would do everything in his power to resolve the situation. However, tensions between Douglass and the McCrossens continued. As to the events on November 21, 1985, the facts are in dispute.
 
 
 5
 Douglass claimed that at the start of work on that afternoon, Jan McCrossen turned on mist collectors on Douglass' machine, an action which could have caused Douglass' machine to malfunction. Douglass complained to her supervisor to no avail. During their lunch break later in the day, Douglass claimed that the McCrossens attempted to hit her with a swinging cafeteria door.
 
 
 6
 At the end of the day while exiting the plant, Douglass alleged that Jan McCrossen shoved her, and Douglass retaliated by grabbing Jan McCrossen around her neck. Robert McCrossen intervened and hit Douglass two or three times on the back of her head/neck. Douglass' son and nephew, who had come to pick her up from work, then jumped on Robert McCrossen. There is dispute as to whether a third person joined Douglass' son and nephew in the altercation with Robert McCrossen. When other employees attempted to pull the young men off of Robert McCrossen, Douglass threatened to kill anyone who bothered her son.
 
 
 7
 Eaton's Human Resources Manager, Rick Blauwiekel, was informed the next day, November 22, 1985, that there had been a physical altercation outside the plant the previous night. Blauwiekel reviewed signed statements from five employees who witnessed the incident, as well as a report by the security guard who was on duty when the incident occurred. These documents contained testimony that as employees left the plant, Douglass "grabbed" or "jumped on" Jan McCrossen and "tossed her to the ground." Robert McCrossen went to his wife's defense by hitting Douglass. Robert McCrossen was then attacked by young men who had come from a car parked in front of the plant. When other employees attempted to halt the attack, Douglass threatened to "kill" these employees if they touched her son. Douglass and at least one of the men who had fought with Robert McCrossen then drove away.
 
 
 8
 On the basis of this information, Blauwiekel determined that Douglass had attacked Jan McCrossen without apparent provocation, thereby violating Eaton's shop rule against fighting. He suspended her pending further investigation. Later, Blauwiekel interviewed Douglass. Douglass told Blauwiekel that Jan McCrossen had switched on a machine near Douglass' work station that cleared oil mist out of the air on the day of the fight, that the McCrossens had swung a door toward her, and that Jan McCrossen had bumped Douglass with her purse or elbow as they left the plant on the day of the altercation. She said that two other employees could confirm this information, but those employees were not able to confirm these allegations. After the interviews, Blauwiekel concluded that Douglass had, without provocation, violently attacked a fellow employee. He then terminated Douglass.
 
 
 9
 At trial, the jury was also presented with the following evidence. Several Eaton employees testified that there was a long history of feuding between Douglass and the McCrossens. Jan McCrossen denied having any problems with Douglass, and Blauwiekel denied knowing of any problems between Douglass and the McCrossens. The initial security report did indicate that there had been problems between them on the day of the altercation during their work shift.
 
 
 10
 Blauwiekel also testified that he was unaware of Eaton's past practice to suspend all participants in a fight until a formal investigation occurred, and that he had no knowledge of past fights at Eaton and the resulting discipline. The Union president, Samuel Foreman, stated that it was "normal procedure" to suspend, rather than terminate, employees involved in physical altercations at Eaton. Eaton's vice president, Richard Honig, also confirmed that the normal procedure following a fight was to suspend all participants. Nevertheless, the company consistently refused to reinstate Douglass and to impose a less severe penalty against her.
 
 
 11
 Douglass also presented evidence at trial regarding disciplinary treatment against blacks and whites who had previously engaged in fights at Eaton. She alleged that the evidence demonstrated a pattern of disparate treatment against racial minorities by Eaton. The district court admitted this evidence at trial after denying a motion in limine submitted by Eaton to exclude the evidence. The evidence included the following:
 
 
 12
 1) T.J. Robinson, who is black, was involved in a fight with Richard Tolles, who is white, in June 1974. There was conflicting evidence as to who provoked the incident. Eaton's record showed that after the two men exchanged heated words, Robinson struck Tolles, and Tolles swung a wild blow at Robinson, but missed hitting him. Eaton then discharged both Robinson and Tolles, but later reinstated Tolles, reducing his penalty to a 30 day suspension.
 
 
 13
 2) Kenneth Carlton, a white employee of Eaton, was the only white employee who was discharged by Eaton for engaging in a physical altercation at the workplace. There was evidence that Carlton had gone home early on the date of the altercation in September 1975. He returned to the plant intoxicated and incoherent, and then attacked a plant foreman, repeatedly striking and kicking the supervisor, who did not hit Carlton in return.
 
 
 14
 3) Two white employees, William Short and Felix Matuzewski, were involved in a fight at Eaton's plant in March 1976. Matuzewski was hospitalized as a result of injuries sustained during this altercation. He was subsequently suspended for three weeks. Short was given six weeks of disciplinary layoff.
 
 
 15
 4) In May 1977, Charles Jarlock, a white employee of Eaton, struck co-worker Mike Horzelski, who is also white, "after provocation," according to Eaton's records. Jarlock was given one week disciplinary layoff.
 
 
 16
 5) In September 1978, Florencio Quiroga, a Mexican-American, hit D. Pinnell, a white employee, in the face. Although both employees told management at Eaton that they were merely goofing around, Eaton discharged Quiroga.
 
 
 17
 6) Charles Culberson and Helen Browning, two black employees, were engaged in an altercation in 1984 when Culberson pushed Browning. Culberson was given a four day disciplinary layoff and warned that he would be discharged for any further incidents.
 
 
 18
 7) Donald Kasper, who is white, was engaged in a physical altercation with a plant supervisor in July 1987 and was subsequently given a one day disciplinary layoff.
 
 
 19
 Following trial, Eaton moved for a directed verdict and argued that the above evidence did not show a pattern of discrimination at Eaton. The district court denied the motion for a directed verdict. The case was then submitted to the jury. On July 25, 1990, the jury returned its verdict, concluding that Eaton discriminated against Douglass on the basis of her race and granted her damages in the amount of $143,154.97. In accordance with the jury verdict, the district court entered judgment in Douglass' favor on October 2, 1990.
 
 
 20
 Subsequently, Eaton submitted a motion for judgment notwithstanding the verdict, or, alternatively, for a new trial. On February 22, 1991, the district court granted the motion. The court ruled that the above evidence of alleged past, comparable conduct regarding fights at Eaton was not relevant as a matter of law and was erroneously admitted into evidence. The district court ruled that these incidents were incomparable to the present case. According to the district court, in each case where Eaton discharged an employee, it was shown that the discharged employee was the "aggressor." Where the employee was not discharged, the employee was a "victim" or it was unclear who the aggressor was. The district court further ruled that Douglass was not similarly situated to "victims" or employees who were not clearly shown to be the "aggressor" during a physical altercation. Therefore, the district court held that the above evidence should have been excluded.
 
 
 21
 The district court held that the remaining evidence was insufficient to support the jury verdict. Accordingly, the district court granted judgment notwithstanding the verdict, or, alternatively, ordered a new trial. Douglass filed a timely appeal.
 
 II.
 
 22
 A. Exclusion of Admitted Evidence Following the Jury Verdict
 
 
 23
 This appeal initially presents a highly unusual circumstance, one that we find quite troubling. Following a jury verdict, the district court in this case ruled that evidence, heard and, presumably, weighed by the jury, was erroneously admitted. After making this delayed evidentiary ruling to reverse itself, the district court granted judgment notwithstanding the verdict, or, alternatively, a new trial based on the alleged insufficiency of the remaining evidence. We are compelled to first address the propriety of this action.
 
 1. Judgment Notwithstanding the Verdict
 
 24
 A district court has authority to grant a judgment notwithstanding the verdict to protect against completely unjust and unsupported results. But this authority is limited by a strict standard of review. It is not enough that the district court disagrees with the verdict. Rather, a judgment notwithstanding the verdict "may be granted only if, viewing the admissible evidence most favorable to the party opposing the motion, a reasonable trier of fact could draw only one conclusion." Hill v. Spiegel, Inc., 708 F.2d 233, 237 (6th Cir.1983). In this case, the district court first ruled that certain evidence at trial was erroneously admitted. Viewing only the "admissible," or remaining, evidence, the district court then ruled that there was insufficient evidence to support the jury verdict.
 
 
 25
 This Circuit has not previously ruled on the propriety of a district court granting a judgment notwithstanding the verdict by ruling at the time of its determination that certain evidence presented at trial was inadmissible. Those circuits that have ruled on the issue have determined that such action is impermissible. See Dixon v. International Harvester Co., 754 F.2d 573, 580 (5th Cir.1985); Midcontinent Broadcasting Co. v. North Central Airlines, 471 F.2d 357, 358 (8th Cir.1973); see also Sumitomo Bank of California v. Product Promotions, 717 F.2d 215, 218 (5th Cir.1983); Townsend v. United States Rubber Co., 74 N.M. 206, 392 P.2d 404, 406-407 (1964). But see Aloe Coal Co. v. Clark Equipment Co., 816 F.2d 110, 115-116 (3rd Cir.), cert. denied, 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 111 (1987) (discussing issue in dicta). In addition to case law, 21 Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5041, at 229-30 (1977), provides that: "The judge cannot grant a judgment notwithstanding the verdict by ignoring evidence he has admitted on the ground that the admission was error."
 
 
 26
 We, too, believe that it is wholly improper for a district judge to ignore evidence admitted at trial from its consideration in granting a judgment notwithstanding the verdict. We agree with the New Mexico Supreme Court that "[a] motion for judgment notwithstanding the verdict, like a motion for a directed verdict, does not raise questions relating to the competency or admissibility of evidence. Therefore, in considering a motion for judgment notwithstanding the verdict, the evidence must be taken as it existed at the close of the trial...." Townsend, 392 P.2d at 406. Moreover, the Eighth Circuit observed in Midcontinent Broadcasting Co. v. North Central Airlines, 471 F.2d 357 (8th Cir.1973), that:
 
 
 27
 The subsequent ruling [to exclude admitted evidence], after the verdict, ... placed plaintiff in a relative position of unfair reliance. If plaintiff had been forewarned during the trial that such [evidence] was not admissible it conceivably could have supplied further foundation or even totally different evidence. Under these circumstances the grant of the judgment n.o.v. was not a proper remedy.
 
 
 28
 Id. at 359. Because we agree that such action is impermissible, we must reverse the district court's grant of judgment notwithstanding the verdict in this case insofar as the judgment was based on the exclusion of evidence admitted at trial.
 
 2. New Trial
 
 29
 The district court granted a new trial as an alternative to its grant for judgment notwithstanding the verdict based on its erroneous admission of evidence regarding prior altercations at the Eaton plant. We must, therefore, consider whether granting a new trial is an appropriate remedy when a district court concludes that evidence at trial was erroneously admitted. All of the above cases addressing this issue have recognized that it is appropriate to order a new trial where the evidentiary error was prejudicial. See Midcontinent Broadcasting Co., 471 F.2d at 358; Sumitomo Bank of California, 717 F.2d at 218; Townsend, 392 P.2d at 407. We agree.
 
 
 30
 Nevertheless, we believe that the order for a new trial was erroneous in this case because the district court abused its discretion in ruling that the comparable evidence was irrelevant. The district court held that the evidence of past occurrences of fighting at Eaton were irrelevant because they were not comparable to the present case.
 
 
 31
 The standard for determining whether evidence is relevant is extremely liberal. Federal Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The district court has broad discretion in determining whether evidence is relevant, and we may only reverse the ruling if the district court has abused its discretion. McGowan v. Cooper Indus., Inc., 863 F.2d 1266, 1271 (6th Cir.1988).
 
 
 32
 We note that in determining whether evidence is relevant, the district court must not consider the weight or sufficiency of the evidence. See Estes v. Dick Smith Ford, 856 F.2d 1097, 1104 (8th Cir.1988); Contemporary Mission, Inc. v. Famous Music Corp., 557 F.2d 918, 927 (2nd Cir.1977). Even if a district court believes the evidence is insufficient to prove the ultimate point for which it is offered, it may not exclude the evidence if it has even the slightest probative worth. See Wright and Graham, supra, § 5165, at 49.
 
 
 33
 With these standards in mind, we conclude that the district court's decision to exclude the evidence in this case was an abuse of discretion. In making its determination that the evidence of past incidents was irrelevant, the district court examined the sufficiency of the comparable evidence, and not merely whether this evidence had "any tendency" to support a consequential fact.
 
 
 34
 Summarizing the comparable evidence, the district court concluded that "of the thirteen employees discussed by the plaintiff in her case in chief, only two ... are truly similarly situated to the plaintiff ... --all three [including plaintiff] were unprovoked aggressors." The district court noted, however, that "none of the other eleven employee examples were involved in similar circumstances mainly because none of the eleven but Robinson was adjudged by the defendant an aggressor." Based on these conclusions, the district court held that "plaintiff presented absolutely no evidence in these regards which met the test of relevance."
 
 
 35
 As we have noted, the test of relevance is very liberal and does not entail a determination of the sufficiency of the evidence. In this case, however, the comparable evidence clearly met the threshold test of relevance. Each of the prior incidents involved a physical altercation between employees at the Eaton plant. In each case, Eaton took disciplinary action pursuant to its shop rule against fighting based on Eaton's assessment of the situation. The district court looked beyond this threshold relevance, however, and ruled that the situations were different based on its interpretation of Eaton's differential treatment of the employees involved. The district court concluded that the evidence was irrelevant because it "failed in adducing anything upon which a factfinder could properly ground a decision based either in direct facts or inferences drawn from the circumstances." This conclusion about the value of plaintiff's evidence was based on the district court's determination of the sufficiency of the evidence, not the relevance. The evidence in this case clearly met the threshold test of relevance, and we conclude that the district court abused its discretion in ruling that the evidence was not relevant. We, therefore, reverse the district court's grant of a new trial.
 
 B. Sufficiency of the Evidence
 
 36
 While the district court may not weigh the sufficiency of evidence in determining its relevance, the court may grant a judgment notwithstanding the verdict if the evidence is insufficient to support the jury verdict. Therefore, we must next determine whether the district court erred in concluding that, viewing all of the evidence presented at trial, the evidence was insufficient to support the jury verdict. We believe that there was sufficient evidence to support the jury verdict.
 
 
 37
 In reviewing a judgment notwithstanding the verdict, "we are bound by the same standard as the court below; that is, after viewing the evidence and drawing all reasonable inferences in favor of the opposing party, are we of the opinion that the evidence 'points so strongly in favor of the movant that reasonable minds could not come to a different conclusion[?]' " Hill, 708 F.2d at 237. The evidence in this case, viewed in favor of Douglass, does not point so strongly in favor of Eaton that reasonable minds could only conclude that Douglass was not discharged discriminatorily in violation of law.
 
 
 38
 Douglass alleged at trial that Eaton discharged her after she engaged in a fight with two white employees. Although there was evidence that her supervisor discharged Douglass based on a reasonable belief that she was an unprovoked attacker, subsequent evidence presented to management at Eaton suggested that Douglass may have been provoked. Several employees testified that there were ongoing tensions between Douglass and the McCrossens. The security report taken on the day of the incident leading to Douglass' discharge noted that there had been problems between Douglass and the McCrossens on the day of the altercation. Moreover, Douglass testified that Jan McCrossen shoved her prior to Douglass grabbing Jan McCrossen around her neck.
 
 
 39
 The Union president testified that Eaton's "normal procedure" was to suspend, rather than terminate, employees involved in physical altercations at Eaton. Eaton's vice president, Richard Honig, confirmed that this was normal procedure. Nevertheless, Eaton upheld its original decision to discharge Douglass. Moreover, Eaton took no disciplinary action whatsoever against either of the McCrossens.
 
 
 40
 Viewing the evidence in favor of Douglass, we note that Eaton's shop rule prohibited "assaulting," "brawling" or "fighting" upon penalty of discharge. By discharging Douglass and neither of the McCrossens, it is obvious that Eaton selectively enforced this rule. It can be argued, however, that Eaton selectively enforced this rule against Douglass as an "assaulter," and not based on her race. The district court concluded, based on the evidence of past incidents, that the company selectively enforced its rule against those who were the "aggressors" in a physical altercation, and enforced the rule against Douglass on that basis. We believe, however, that there was sufficient evidence to support the jury verdict that Eaton's selective enforcement of the shop rule was based on race.
 
 
 41
 Douglass' evidence of prior incidents showed that virtually all of the racial minorities who were involved in fights at Eaton were discharged. In the single instance where a black was not discharged, the employee was warned that any further incidents would result in a discharge. On the other hand, only one white employee was discharged for fighting at Eaton. The latter two exceptions were, indeed, exceptional circumstances.
 
 
 42
 Where the only black involved in a fight was not discharged, the altercation was notably minor. In that case, Charles Culberson "pushed" another black employee, Helen Browning. Culberson was suspended for four days and warned of discharge.
 
 
 43
 Where the only white involved in a fight was discharged, the altercation was notably egregious. Kenneth Carlton literally attacked a supervisor in this altercation, after coming to the plant intoxicated and incoherent. Carlton repeatedly hit and kicked the supervisor, who not once hit Carlton.
 
 
 44
 The district court viewed this same evidence and attempted to "categorize" the employees involved in the altercations as "aggressors," "victims," or persons involved in an altercation but who were not shown to be an aggressor. We do not accept this strained interpretation of the evidence as the only plausible interpretation. We believe that the jury could conclude that Eaton treated whites and racial minorities differently in assessing the situations and in deciding to discharge minority, but not majority, employees.
 
 
 45
 The jury could have reasonably interpreted this evidence to conclude that Eaton was more likely than not to have acted from an unlawful motive in deciding to permanently discharge Douglass. Drawing this inference in favor of Douglass, coupled with evidence that Douglass was not an "unprovoked aggressor," we believe that there was sufficient evidence to support the jury verdict. Accordingly, we reverse the district court's grant of judgment notwithstanding the verdict.
 
 III.
 
 46
 Finally, we also reverse the district court ruling on damages. Based on the above, we conclude that Douglass was entitled to damages for lost wages. We believe, however, that the jury erred in failing to deduct Douglass' earnings from other employment between her discharge and the trial in its calculation of lost wages. Therefore, we affirm the award of damages minus $9,980.77, which Douglass earned from other employment.
 
 IV.
 
 47
 For the reasons set forth above, we REVERSE the district court grant of judgment notwithstanding the verdict or a new trial; REINSTATE the jury verdict in favor of Douglass, including damages less $9,980.77; and REMAND to the district court for further proceedings consistent with this opinion.
 
 
 48
 RYAN, Circuit Judge, concurring separately.
 
 
 49
 While I agree, for the reasons stated in the majority opinion, that the district court erred in granting the judgment notwithstanding the verdict, and agree that the court erred in granting, alternatively, a new trial, I do not subscribe entirely to the reasoning in support of the new trial issue as developed in part II.B. of the majority opinion. I should like, therefore, to offer a somewhat different analysis.
 
 
 50
 The majority opinion, in my judgment, correctly concludes that the district court erroneously granted a new trial in this case.
 
 The court holds that:
 
 51
 [T]he district court examined the sufficiency of the comparable evidence, and not merely whether this evidence had "any tendency" to support a consequential fact[,]
 
 
 52
 and therefore drew a
 
 
 53
 conclusion about the value of the plaintiff's evidence ... based on ... [a] ... determination of the sufficiency of the evidence, not the relevance."
 
 
 54
 (Emphasis in original.) Respectfully, while the district court did so and should not have, it should not have for a reason apparently not recognized in the majority opinion.
 
 
 55
 The district court ruled, as a preliminary finding of fact under Fed.R.Evid. 104(a), that the eleven alleged incidents of employee misconduct were not in fact comparable to Douglass' situation and, therefore, were not admissible on relevancy grounds.
 
 
 56
 It is quite proper, indeed, mandated by Fed.R.Evid. 104(a), that the trial court, in a jury trial, decide preliminary questions of fact "concerning ... the admissibility of evidence...." The court, therefore, and not the jury, is the fact finder in a host of threshold fact issues that must be resolved preliminarily in order to determine the admissibility of evidence. Thus, for example, the court, not the jury, decides, for purposes of determining the admissibility of a confession, whether it was voluntarily given or, where applicable, given only after compliance with Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Jackson v. Denno, 378 U.S. 368, 378-79, 84 S.Ct. 1774, 1781-82, 12 L.Ed.2d 908 (1964). So too the court decides, as a preliminary fact question, whether a statement is made "during the course and in furtherance of [a] conspiracy" under Fed.R.Evid. 801(d)(2)(E), United States v. Enright, 579 F.2d 980, 984 (6th Cir.1978); and whether a prior statement of a witness concerning the identification of a person was made "after perceiving [the person]" under Fed.R.Evid. 801(d)(1)(C), United States v. Hudson, 564 F.2d 1377, 1379 (9th Cir.1977). All of the stated examples, and a host of others, are situations in which the trial court is required to make a preliminary finding of fact in jury trials, in order to determine whether proffered evidence bearing on the relevant issues shall be admitted. In all such preliminary fact finding, the trial court must necessarily make "conclusion[s] about the value of the plaintiff's evidence ... based on the district court's determination of the sufficiency of the evidence ..." relating to the preliminary question.
 
 
 57
 That is what the district court did with respect to the preliminary question at issue in this case: it determined whether the alleged comparable situations at Eaton were in fact comparable. But the court's error was in failing to apply the "subject to subdivision (b)" exception of Rule 104(a) which directs, in effect, that in one specific situation, and this case presented that situation, the decision on the preliminary question of fact determining the admissibility of evidence must be shared with the jury. That one circumstance is where the preliminary fact question determines the relevancy of evidence.
 
 Fed.R.Evid. 104(a) states:
 
 58
 (a) Questions of admissibility generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.
 
 
 59
 Thus, Fed.R.Evid. 104(a) directs the judge to make preliminary fact determinations governing the admissibility of evidence subject, however, to the provisions of subdivision (b).
 
 Subsection (b) of Rule 104 states:
 
 60
 (b) Relevancy conditioned on fact. When the relevance of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.
 
 
 61
 Thus, Rule 104(b) commands that with respect to the relevance of evidence, as distinguished from some other basis for admissibility, the court must receive the evidence "subject to the introduction of evidence sufficient to support a finding of the fulfillment of the condition."
 
 
 62
 The somewhat opaque language of Rule 104(b) means that when the admissibility of evidence is properly challenged on relevancy grounds, and a preliminary question of fact must be decided in order to determine whether the proffered evidence is relevant, the trial court's duty is to share the admissibility question with the jurors. It does so by admitting the challenged evidence, providing there is any evidence at all that would support a finding that the condition has been fulfilled, and leaving it to the jurors to determine both the preliminary question that determines the relevance of the underlying evidence and the value of the underlying evidence.
 
 
 63
 How does that apply here?
 
 
 64
 The preliminary question of fact in this case is whether the eleven proffered instances of Eaton disciplining employees of different races for fighting on the premises are comparable to its disciplining of Douglass. If the answer is yes, the eleven instances may be relevant as tending to prove a pattern of discrimination. If the answer is no, the eleven incidents are not relevant and, theoretically, are not to be considered by the jury. But someone must decide the preliminary comparability question. Since that preliminary fact question (there are actually eleven such preliminary questions) determines the relevancy of the eleven incidents, Rule 104(b) commands that the issue be given to the jury subject to proof "sufficient to support a finding [by the jury] of the fulfillment of the condition."
 
 
 65
 The district court did not do that. Failing to recognize, apparently, that the preliminary question (whether the other incidents were comparable) determined the relevancy of the evidence as distinguished from some other basis for admissibility, the court decided the preliminary questions itself rather than submitting them to the jury under 104(b).
 
 
 66
 If the district court had recognized the interplay of Fed.R.Evid. 104(a) and (b), it would have let the jury decide whether the "comparables" were indeed comparable, because that determines their relevance, subject only to the court's threshold determination of whether there was enough evidence to permit a reasonable juror to find that they were comparable.
 
 
 67
 Rule 104(b)'s conditional relevancy concept is abstruse, to say the least, and not easy to apply. This case presents a textbook example of its application.
 
 
 68
 It may be objected, however, that the district court, while not articulating all of the foregoing analysis, nevertheless got it right because it correctly ruled, in effect, that the condition precedent for admissibility under Rule 104(b) was not met. That is, it may be objected that there was absolutely no "evidence sufficient to support a finding" by the jury that the eleven incidents or any of them were comparable.
 
 
 69
 This is, after all, what the district court appears to have said:
 
 
 70
 The court must conclude that plaintiff presented absolutely no evidence ... which met the test of relevance, and thus utterly failed in adducing anything upon which a factfinder could properly ground a decision based either in direct facts or inferences drawn from circumstances.[1]
 
 
 71
 But, in my judgment, even if the court's ruling could be read in that fashion, the court was mistaken. Not all of the alleged comparable incidents were totally devoid of evidence sufficient to support a finding by a reasonable juror that they were comparable to the Douglass-McCrossen situation. It was for the jury to say whether Eaton sincerely believed that Douglass was an aggressor; whether comparability required a nonminority actor who was an aggressor; whether the nonminority actors in the comparable situations were indeed not aggressors; whether a Latino is a comparable minority person; and whether the responsible person acting for the employer knew of the other instances and perceived them to be comparable.
 
 
 72
 While those are indeed preliminary questions of fact determining the admissibility of evidence, they are not matters of legal esoterica beyond the ken of the jurors. They are not questions involving such technical rules of admissibility as to require a law school education in the law of evidence--in other words, the kind that Fed.R.Evid. 104(a) reserves to the trial judge for decision. They are commonsense, everyday issues of historic fact of the kind laymen face in their own affairs and are fully capable of deciding. Stated otherwise, they are mere matters of relevancy, not matters involving technical rules of admissibility of evidence. One needs no training in the law of evidence to decide any of these questions, and that is precisely why Fed.R.Evid. 104(b) commits them to the jurors for decision.
 
 
 73
 For the foregoing reason, the district court erred, in my judgment, in ruling, as a matter of law, that the alleged comparable incidents were not comparable, thus retroactively "removing" them from the jury's consideration. Ironically, the district court decided correctly at the trial; its error occurred in reversing itself in ruling on the defendant's motion, in the alternative, for a new trial.
 
 
 74
 I concur, therefore, in the judgment of reversal and in the reinstatement of the verdict as reduced.
 
 
 
 *
 The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation
 
 
 [1]
 The "test of relevance" was unmet, the court said, because:
 1) [T]he evidence of two non-minority "aggressor employees" showed that each was treated the same as the plaintiff, and therefore was not admissible; and 2) the evidence of ten employees treated less stringently than plaintiff showed that each was not an aggressor, and therefore was not admissible; and 3) evidence of the eleventh of the other employees showed that he, although an aggressor, was himself a minority class member, and therefore was not admissible.